**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CTIA – THE WIRELESS ASSOCIATION,<br><br>                      Petitioner,<br><br>    v.<br><br>ANDREW COHEN, et al.,<br><br>                      Respondent. | MISC. NO.: |

**MEMORANDUM IN SUPPORT OF CTIA – THE WIRELESS ASSOCIATION'S
MOTION TO QUASH PLAINTIFF'S SUBPOENA *DUCES TECUM***

**INTRODUCTION**

In a case that involves claims that Apple iPhones are unsafe and non-compliant with FCC regulations, Respondents, who are Plaintiffs in *Cohen v. Apple Inc.*, Case No. 3:19-cv-05322-WHA (N.D. Cal.) ("*Cohen*"), seek broad and wide-ranging third-party discovery from a trade association that does no testing for radiofrequency ("RF") exposure compliance, sells no phones, and has no role in FCC-certification of Apple iPhones.[1]  Therefore, CTIA – The Wireless Association ("CTIA") seeks to quash Plaintiffs' improper subpoena *duces tecum*, Ex. A, Subpoena *Duces Tecum* on CTIA – The Wireless Association (the "Subpoena"), in *Cohen* for two independent reasons.

*First*, federal law preempts Plaintiffs' claims and therefore discovery is unnecessary.  The Court in the underlying action noted in a February 10, 2020 Order that it "is inclined to hold that if the Apple products ultimately satisfy the Commission's standard, then all claims must be dismissed on preemption grounds." Order Converting Motion To Dismiss Into Motion for Summary Judgment and Allowing Immediate Discovery, *Cohen*, Dkt. 89 at 4 ("Feb. 10, 2020

---

[1] CTIA refers to Respondents also as "Plaintiffs" throughout this Memorandum to reflect their status in *Cohen*.

1

Order"). The Court also entered an Order requesting the FCC to provide its views. *Cohen*, Dkt. 90. On April 13, 2020, the FCC filed a "Statement of Interest" confirming that Apple's phones satisfied the FCC's standard for RF emissions both when the FCC certified the phones for sale in the United States, and again when the FCC tested the phones following a Chicago Tribune article claiming non-compliance. April 13, 2020 FCC Statement of Interest, *Cohen*, Dkt. 101-1 ("FCC Statement of Interest"). The FCC Statement of Interest makes clear that once the FCC certifies phones for sale in the United States, the FCC deems those phones as compliant and "safe" for consumer use, and any state-law determination to the contrary is preempted because it would "undermine the FCC's efforts to create and implement a uniform and reliable process for certifying that cell phones comply with RF limits." *Id.* at 15. Therefore, no more discovery is necessary.

*Second*, the Subpoena imposes an undue burden on CTIA, a nonparty to this litigation, because it is overly broad and not reasonably tailored to discover relevant evidence. The documents sought have no bearing on the core issue in the case—whether Apple's phones comply with FCC regulations—and, in any event, can reasonably be discovered from other sources, including the FCC and Apple. The resources needed to comply with the Subpoena would impose a significant and unreasonable financial burden on CTIA, particularly given its nonparty status in this case and Plaintiffs' ability to get the information from the parties themselves. The Court should therefore quash the Subpoena.

## RELEVANT BACKGROUND

    a.    **CTIA and Plaintiffs' Subpoena**

CTIA represents the U.S. wireless communications industry and the companies. Ex. B, Declaration of T. Power, at ¶ 3. Its members include wireless carriers, device manufacturers,

suppliers as well as apps and content companies. *Id.* CTIA advocates at all levels of government for policies that foster continued wireless innovation and investment. *Id.* at ¶ 4. The association also coordinates the industry's voluntary best practices, supports educational efforts that promote the wireless industry, and co-produces the industry's leading wireless tradeshow. *Id.* CTIA was founded in 1984 and is based in Washington, D.C. *Id.* at ¶ 5.

CTIA's primary activity is advocating for government policies that will promote wireless innovation and investment at the Federal, state, and local level. *Id.* at ¶ 6. CTIA also files amicus briefs, intervenes, or otherwise participates in litigation and appeals related to government regulation. *Id.* In addition, CTIA manages several device certification programs designed to ensure device compliance with industry standards and with technical specifications of individual wireless carriers, but not related to standards and specifications for RF exposure. *Id.* at ¶ 7. CTIA authorizes qualified independent test labs to test devices according to CTIA's published requirements. *Id.* at ¶ 8. However, critical to this matter, none of the certification requirements or testing procedures managed or authorized under these programs involves testing, examining, or certifying devices with respect to any FCC requirements, including RF exposure compliance. *Id.* at ¶¶ 9-10. Thus, CTIA has no role in the FCC's certification or authorization of any manufacturer's cell phone, including RF exposure compliance.

On March 24, 2020, counsel for Plaintiff served the Subpoena on CTIA. The Subpoena calls for a broad range of documents regarding "RF emissions, SAR Regulations, and/or Potential Health Effects," including "internal communications," "communications with or relating to Apple," and numerous other broad categories of documents. *See* Ex. A. Additionally, the Subpoena requests documentation showing "all payments made by Apple to CTIA," documents "concerning the Action," and CTIA's "retention, destruction, deletion, and disposal

policies and practices" dating back to 2008. *Id.* The return date on the subpoena is April 1, 2020, but CTIA requested an extension until May 1, 2020 so that CTIA would have "sufficient time to prepare a response, whether it's a motion to quash, objections, or substantive responses or a combination," and Plaintiffs agreed.

### b. Plaintiffs' Claims

Plaintiffs concede that Apple's iPhones are FCC-certified. Plaintiff's Am. Complaint, *Cohen*, Dkt. 53, at ¶ 8 ("Am. Complaint"). But Plaintiffs assert that Apple "cannot hide behind regulatory compliance," alleging that when Apple's iPhones "are tested in the ways that people use them in real life" they "regularly exceed[] the RF radiation limits set by law." *Id*. ¶¶ 3, 7, 8. Plaintiffs' allegations of regulatory non-compliance are not based on FCC testing. Instead, Plaintiffs base their allegations on testing commissioned by the Chicago Tribune in 2018 and Plaintiffs in 2019, by "a laboratory accredited by the" FCC. *Id*. ¶¶ 3-4, 8. Following the Chicago Tribune article, the FCC tested Apple's iPhones and found that "all tested sample devices comply" and that their tests "did not produce evidence of violations of any FCC rules" related to RF exposure. "Results of Tests on Cell Phone RF Exposure Compliance," FCC, Dec. 10, 2019, https://docs.fcc.gov/public/attachments/DOC-361473A1.pdf ("Report on FCC Testing"). Nevertheless, Plaintiffs allege that Apple's "marketing and sale of smartphones as being safe when used against the skin or near the body" is "deceptive and misleading." Am. Complaint at ¶ 10. Based on these allegations, Plaintiffs assert seven claims, all premised on the same allegations that: (1) Apple's smartphones emit "unsafe" levels of RF that exceed federal limits; and (2) Apple failed to adequately warn consumers of the actual RF emission levels and dangers when iPhones are "used on or in close proximity to the[ir] . . . bod[ies]." Am. Complaint Counts I, III, V, VII, IX, XI & XIII.

# ARGUMENT

### a.   Standard for Motion to Quash

A court must quash or modify a subpoena if it is unduly burdensome to the recipient. FED. R. CIV. P. 45(d)(3)(A)(iv).  The court must balance "[the] relevance [of the materials sought], the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Educ. Fin. Council v. Oberg*, 2010 WL 3719921, at *2 (D.D.C. Mar. 8, 2010) (internal citation omitted); *see also Free Stream Media Corp. v. Alphonso Inc.*, 2017 WL 6209309, *5 (N.D. Cal. Dec. 8, 2017).

### b.   Federal Law Preempts Plaintiffs' Claims

Less than five months ago, the FCC issued an Opinion and Order after an extensive review of its RF emissions standards, compliance testing procedures, and disclosure requirements. *See In re Proposed Changes in the Commission's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields*, FCC 19-126, 2019 WL 6681944 (Dec. 4, 2019) ("*FCC Order*").  More recently, on April 13, 2020, in response to a request from the *Cohen* court, the FCC filed a Statement of Interest in *Cohen* that evaluated Plaintiffs' claims in the context of the *FCC Order*.  FCC Statement of Interest at 19.  The FCC confirmed its role of "balancing the goal of facilitating broad deployment of wireless telecommunications technology, while safeguarding the health of American consumers." *Id.* at 1.  The FCC also described its RF emissions standards, the procedures for compliance testing, and the FCC procedures for certifying phones for sale in the United States.  In addition, the FCC explained why federal preemption barred Plaintiffs' claims in *Cohen*.

*First*, "no scientific evidence establishes a causal link between wireless device use and cancer or other illnesses," *FCC Order* ¶¶ 10-12, and therefore all "phones legally sold in the United States pose *no health risks*." *Id.* ¶ 14 (emphasis added).  Specifically the FCC noted:

> Under the FCC's equipment authorization regime, if an applicant for authorization tests its cell phones in accordance with FCC testing procedures, if the tests demonstrate that the phones comply with the agency's RF exposure limits, and if the applicant demonstrates that its phones comply with all other applicable rules and regulations, the Commission will certify the cell phones for sale in the United States. In the FCC's judgment, any cell phones certified in this manner "pose no health risks."

FCC Statement of Interest at 14 (quoting *FCC Order* at ¶ 14).  Therefore, federal law preempts claims that FCC-certified phones are unsafe: "Any claim that FCC-certified cell phones are unsafe . . . preempted by federal law, because it conflicts with the FCC's judgment that cell phones that satisfy the FCC's RF standards pose no health risk and may be certified for sale in the United States." *Id.* at 2.  That conclusion applies even if FCC-certified phones may exceed the FCC limits under certain use conditions: "the Commission found that 'even if certified or otherwise authorized devices' might 'produce RF exposure levels in excess of Commission limits under normal use' when used against the body, any 'such exposure would still be well below levels considered to be dangerous' because the FCC's RF limits 'are set with a large safety margin.'" *Id.* at 17 (quoting *FCC Order* at ¶ 14).

*Second*, the FCC reiterated that "'any claim as to the adequacy of the FCC required testing, certification, and authorization regime is no different than a challenge to the adequacy of the federal RF exposure limits themselves.  Both types of claims would undermine the FCC's substantive policy determinations.'" FCC Statement of Interest at 15 (quoting *FCC Order* ¶ 14 n. 49).  Thus, only the FCC can determine whether a phone is compliant with its RF exposure regulations.  Allowing courts to make compliance determinations related to FCC-compliant phones based on their own or third-party testing would constitute a challenge to the FCC's

6

regime and "undermine the FCC's efforts to create and implement a uniform and reliable process for certifying that cell phones comply with RF limits." *Id.* at 15 ("Allowing this case to proceed and 'permitting alternative state [certification] standards to arise via the imposition of liability' in this lawsuit 'would conflict with the [FCC's] deliberate policy choice.'" (quoting *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3rd Cir. 2010) and citing *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 881 (2000)). Indeed, the FCC pointed to the likely flaws in Plaintiffs' *own testing* as an example of how compliance determinations by courts would undermine its policy objectives: "These complex technical issues of phone design and configuration underscore the need for a uniform certification regime. Lawsuits like this one would needlessly disrupt the Commission's certification process and improperly impede the marketing of cell phones that the FCC has found to be safe." FCC Statement of Interest at 16. That is particularly so because the FCC rejected compliance procedures that would require testing at closer separation distances to the body, including "testing with a 'zero'-spacing' – against the body." *FCC Order* ¶ 14.

*Third*, the FCC rejected calls for more consumer disclosures, concluding that the RF exposure information provided in product manuals and on the FCC website strike the appropriate balance between two FCC policies: informing consumers of relevant information and protecting against "overwarning." *Id.* at ¶ 16; FCC Statement of Interest at 18. As part of the certification process, the FCC reviews manufacturers' product manuals "to ensure that relevant information is made available to the public." *See* 47 C.F.R. § 2.1033(b)(3); *FCC Order* ¶ 16. The FCC also provides relevant information on its website. *FCC Order* ¶ 16. The FCC determined that the disclosures in the manuals and on its website are sufficient:

> In the end, "[g]iven the federal safety determination" that RF emissions from certified cell phones pose no health risks, the Commission concluded that the information on its website "and in device manuals" was not only "adequate to inform consumers of [RF exposure] issues," but also did "not risk contributing to

7

>an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices."

FCC Statement of Interest at 18 (quoting *FCC Order* ¶ 16). With respect to Plaintiffs' claims in this case, the FCC concluded that Plaintiffs' proposed "additional consumer disclosures regarding its FCC-certified cell phones" conflict with the FCC's balancing of "adequately inform[ing] the American public" and its "legitimate interest in guarding against 'overwarning' about the potential dangers of" FCC-certified cell phones. *Id.* at 18, 20; *see also id.* at 19 ("Plaintiffs' claims regarding the adequacy of Apple's disclosure . . . conflict with the FCC's considered policy judgment regarding how best and in what form to disseminate relevant information about RF exposure to the public."). The FCC also confirmed that it "will continue to evaluate public information materials and update as appropriate" and "continue to ensure that relevant information is made available to the public." *FCC Order* ¶ 16; *see also* FCC Statement of Interest at 17 (noting that the *FCC Order* "affirmed" the FCC's "commitment" to ensuring that appropriate information reaches the public).

The FCC's preemption position is consistent with federal preemption case law generally and case law specific to FCC regulations of RF emissions from cell phones. Federal law preempts any state law that stands as an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Wyeth v. Levine*, 555 U.S. 555, 563–64 (2009) (quotation marks omitted). "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). "The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof." *City of New York v. FCC*, 486 U.S. 57, 64 (1988). And where federal regulations strike a balance between competing national priorities, state prescriptions in the same area can stand as an "obstacle" to achievement of the federal

goals, because federal law serves as a regulatory ceiling as well as a floor. *See*, *e.g.*, *Geier*, 529 U.S. at 886.

Claims challenging the safety of FCC-certified cell phones are preempted because they interfere with and stand as an obstacle to the FCC's balancing of policy goals in setting those standards. *Farina*, 625 F.3d at 125 ("In order to satisfy both its mandates to regulate the safety concerns of RF emissions and to ensure the creation of an efficient and uniform nationwide network, the FCC was required to weigh those considerations and establish a set of standards that limit RF emissions enough to protect the public and workers while, at the same time, leav[ing] RF levels high enough to enable cell phone companies to provide quality nationwide service in a cost-effective manner."). Here, Plaintiffs' claims are preempted because they interfere, in multiple ways, with the FCC's comprehensive, uniform regulation of RF energy emissions from cell phones and related disclosures.

For example, there is no dispute that the FCC certified Apple's iPhones for sale in the United States. FCC Statement of Interest at 2. And Plaintiffs concede that each of their claims is based on the allegation that FCC-certified phones are "unsafe." *See generally* Am. Complaint at ¶¶ 91-100. Thus, Plaintiffs' claims conflict with the FCC's regulations because a "jury determination that cell phones in compliance with the FCC's SAR guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives." *Farina*, 625 F.3d at 125; *Murray v. Motorola, Inc.*, 982 A.2d 764, 777–778 (D.C. 2009) ("insofar as Plaintiffs' claims rest on allegations about the inadequacy of the FCC's RF radiation standard or about the safety of their FCC-certified cell phones, the claims are preempted under the doctrine of conflict preemption.").

Moreover, Plaintiffs cannot avoid preemption by seeking a state-law determination that

9

Apple's iPhones do not comply with the FCC's RF regulations. Only the FCC can determine certification under its regulations in order to ensure "a uniform certification regime." FCC Statement of Interest at 16. As the FCC explained, "[l]awsuits like this one would needlessly disrupt the Commission's certification process and improperly impede the marketing of cell phones that the FCC has found to be safe," and "would undermine the FCC's efforts to create and implement a uniform and reliable process for certifying that cell phones comply with RF limits." *Id.* at 15-16. Federal preemption bars Plaintiffs' challenges to the FCC's certification of Apple's phones because the "wireless network is an inherently national system," and claims like Plaintiffs' with "resulting state-law standards could vary from state to state, eradicating the uniformity necessary to regulating the wireless network." *Farina*, 625 F.3d at 126 ("Subjecting the wireless network to a patchwork of state standards would disrupt that uniformity and place additional burdens on industry and the network itself.").

That does not mean Plaintiffs and others like them are left without a remedy. They could present their non-compliance claims directly to the FCC: "The FCC takes claims of non-compliance with its regulations seriously." FCC Statement of Interest at 15 (quoting from Report on FCC Testing at 3). Thus, "in the wake of the Chicago Tribune report in August 2019, the FCC laboratory conducted its own tests of Apple's" iPhones. *Id.* at 15. If the FCC "had found evidence that any cell phones did not comply with its RF limits, it would have taken appropriate measures to enforce those limits." *Id.* at 16, n. 6. And if Plaintiffs wanted to properly challenge the FCC's testing regime adopted in the 2019 *FCC Order*, then they could have filed a petition for review, as others have done, in the federal courts of appeals. *Id.* at 6, n. 1, n. 11.

Similarly, Plaintiffs cannot avoid preemption by asserting failure to warn and misrepresentation claims based on the theory that Apple should have disclosed more RF

10

information in its manuals. The FCC itself makes information about "wireless devices and health concerns" available to the public. *FCC Order* ¶ 16. The FCC reviews user manuals as part of the process of certifying cell phone models, and monitors whether cell phone manufacturers include appropriate information about RF emissions. *See* 47 C.F.R. § 2.1033(b)(3). But the FCC has made clear that disclosures "about FCC-certified cell phones that go beyond those mandated by the FCC could mislead consumers into believing that RF emissions from those phones are unsafe." FCC Statement of Interest at 2; *Farina*, 625 F.3d at 129 ("there is no indication . . . that either Congress or the FCC traditionally viewed state regulation of RF emissions as a necessary complement to federal regulation"). Thus requiring more information like Plaintiffs seek would "conflict with the FCC's considered policy judgment" against over warning and is therefore "preempted." FCC Statement of Interest at 19; *see Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323, 332 (2011) (where "manufacturer choice was an important regulatory objective," state law "restrict[ing] that choice" was preempted); *Farina*, 625 F.3d at 130 (the FCC's balancing of dual interests "would be skewed by additional state restrictions in a manner that the objectives behind pharmaceutical labels would not be"); *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1135-36 (9th Cir. 2005) (holding that federal disclosure rules preempt disclosure requirements imposed by the California Ethics Standards).

Before the FCC submitted its Statement of Interest in *Cohen*, the Court ruled that the preemption inquiry required additional discovery to understand, for example, "how two different 'FCC-certified Labs' could come to opposite conclusions." Feb. 10, 2020 Order at 3. With the FCC's Statement of Interest, there now can be no doubt that there is conflict preemption, because allowing Plaintiffs across the country to set their own state-law safety standards, FCC-certification determinations and require their own scripted warnings or messages would undermine the

nationwide uniformity that Congress tasked the FCC with securing and stand as an obstacle to federal objectives.  *See Farina*, 625 F.3d at 126 (explaining that "both Congress and the FCC recognized uniformity as an essential element of an efficient wireless network").  Accordingly, no discovery is necessary and the Court should quash the Subpoena.

        c.        **The Subpoena imposes an undue burden on nonparty CTIA**

Under the Federal Rules of Civil Procedure, a nonparty subpoena must comply with discovery standards, including Rule 26(b) permitting parties to seek only nonprivileged documents that are "relevant to the subject matter involved in the pending action."  *In re Subpoena to Goldberg*, 693 F.Supp.2d 81, 83 (D.D.C. 2010); *see also Glass Egg Digital Media v. Gameloft, Inc.*, 2019 WL 4166780, *3 (N.D. Cal. Sept. 3, 2019) ("The Rule 26 relevancy standard also applies to third-party subpoenas.").  The requests must likewise be proportional to the litigation.  *Breiterman v. U.S. Capitol Police*, 323 F.R.D. 36, 42 (D.D.C. 2017); *see also Baxalta Inc. v. Genentech, Inc.*, 2016 WL 11529803, *3 (N.D. Cal. Aug. 9, 2016) (noting discovery, including that sought from a nonparty, must be "proportional to the needs of the case").  Regardless of the fact that Plaintiffs' claims are preempted, the broad scope of evidence sought by Plaintiffs makes the Subpoena overbroad and unduly burdensome to CTIA.

As an initial matter, the core issue in this case is whether Apple's phones comply with the FCC RF exposure standards.  *See generally* Am. Complaint.  Thus at this stage in the litigation, even if not preempted, Plaintiffs' discovery of third parties should be limited to compliance issues.  The Subpoena seeks documents from CTIA that have no bearing on the issue at hand in the litigation.  CTIA is a trade association, not an RF exposure compliance testing organization.  Its documents have no bearing on whether Apple's mobile phones comply with FCC regulations on RF exposure limits.  CTIA does not set any sort of standards with respect to RF exposure for

mobile phones. The FCC has not certified CTIA to test mobile phones for compliance with RF exposure standards. Nor does CTIA test Apple mobile phones for RF exposure compliance. The only entity that has any authority to assess compliance with FCC regulations is the FCC itself. Any information regarding Apple's compliance with FCC regulations can most easily—and should only—be sought and obtained directly from the FCC.

Compliance with the subpoena would also be unduly burdensome for CTIA. The Subpoena seeks broad categories of information far beyond what is relevant to compliance or any other issue in this case. By seeking documents irrelevant to the litigation, Plaintiff places an undue burden on CTIA. *See Unsworth v. Musk*, 2019 WL 5550060 *6 (N.D. Cal. Oct. 28, 2019) ("Where the information sought is not relevant to a claim or defense[,] then any burden whatsoever imposed would be by definition undue.") (internal citations omitted). Furthermore, even if relevant, much of the information could be obtained from a more convenient, less burdensome, and less expensive source –either from Apple itself or the FCC. *See* FED. R. CIV. P. 26(b)(2)(i); *see In re Subpoena to Goldberg*, 693 F.Supp.2d at 88 (quashing a nonparty subpoena where defendants could more conveniently obtain relevant discovery from the plaintiff); *see also Glass Egg Digital Media*, 2019 WL 4166780 at *5 (quashing a nonparty subpoena where discovery sought could be obtained directly from the defendant).

- Document Request No. 1 seeks an unreasonably broad range of information on vague topics that are not narrowly tailored to this litigation. *See* Ex. A at 5. Requests for documents such as "internal communications" and "communications with a Government Agency" on RF provide vague direction as to what Plaintiffs seek. Plaintiffs likewise seek broadly "analyses, reports, surveys and white papers" and "documents relating to consumer understanding or knowledge" of RF emissions. *Id.* This broad range of

13

information is not relevant to Apple's compliance with FCC RF exposure regulations. Plaintiffs' request for documents relating to Telecom Italia is likewise completely irrelevant, as Telecom Italia is not a party to this litigation, nor does it have anything to do with Apple's compliance with FCC regulations. Plaintiffs' also seek documents from CTIA relating to information mobile phone manufacturers provide to consumers, yet what is relevant is Apple's communications with consumers, which Plaintiffs can get from Apple.

- Document Request No. 1 also seeks CTIA documents relating to various FCC reports, resolutions, dockets, and to "statements made on the FCC's website." *Id.* Any information CTIA has regarding these FCC documents is not relevant to this case and should instead be sought directly from the FCC itself. Plaintiffs' seek CTIA communications with Apple—communications that can most certainly be obtained from Defendant Apple, who is actually a party to this litigation. The request is also not narrowly tailored to obtain admissible evidence, as CTIA's communications with Apple, even if related to RF emissions, have no bearing on Apple's compliance with FCC regulations and therefore have no relevance to this litigation.

- Document Request No. 2 seeks documents showing payments made by Apple to CTIA and the purpose of the payments. *Id.* As a member of CTIA, Apple does make payments to CTIA for membership and certain services. These payments, and any documentation of them, have no relation to or bearing on whether Apple's mobile phones complied with FCC regulations on RF exposure or any other issue in the case. Plaintiffs do not narrowly identify any particular payments or types of payments for which they seek documentation, making the request overly broad.

- Document Request No. 3 seeks documents concerning this litigation even though CTIA is not a party. *Id.* at 6. It is unduly burdensome to seek documents related to the Action from a nonparty like CTIA, who is not involved in the litigation. Plaintiffs do not even provide specific details on what information related to the Action it seeks from CTIA that it could not obtain from parties to the litigation. Anything non-privileged and relevant to the litigation can, and should be, obtained from the parties themselves.

- Document Request No. 4 seeks documents related to CTIA's document retention policies dating back to 2008. *Id.* at 6. CTIA's internal document retention policies have absolutely no connection or relevance to this litigation.

Furthermore, the Subpoena subjects CTIA to undue financial burden. Plaintiffs' broad-ranging and vague requests dating back over the last twelve years would require CTIA to spend significant time, labor, resources, and expense to locate and identify potentially responsive documents. *See* Ex. C, Declaration of Scott Rasmus. In weighing undue burden, the court must "be generally sensitive to the costs imposed on third-parties." *Educ. Fin. Council*, 2010 WL 3719921 at *2; *see also Free Stream Media Corp.*, 2017 WL 6209309 at *5. As the trade association for the wireless industry, CTIA possesses hundreds of thousands of documents from the last twelve years that would need to be searched and reviewed to determine responsiveness. *See* Ex. C at ¶ 3. The extremely broad nature of the Subpoena's requests would do very little to narrow the universe of documents. *See id.* at ¶ 4. Conducting a broad search of such an expansive body of materials and documents would be costly and time-consuming for CTIA and impose an undue burden on CTIA as a nonparty. *See id.* at ¶¶ 4-13. Many of the documents are stored off-site and on old servers or tapes that would require CTIA to engage a third party vendor to access and review. *Id.* at ¶¶ 9-12. Furthermore, due to the COVID-19 pandemic and the

Mayor of D.C.'s Order 2020-063, most of CTIA's staff is working from home, making it nearly impossible for CTIA to conduct physical collections and reviews of documents necessary to comply with the Subpoena.  *Id.* at ¶¶ 6-8, 11.  CTIA would also need to review all documents for privilege, requiring additional time and resources.  Compliance with the Subpoena would force CTIA to put unreasonable resources and expense (potentially hundreds of thousands of dollars) toward identifying allegedly responsive documents that are not even relevant to this litigation.  The Subpoena places an undue burden on CTIA and must therefore be quashed by the Court.

## **CONCLUSION**

For the reasons set forth above, CTIA respectfully requests this Court quash the Subpoena.

Dated: May 1, 2020        McDERMOTT WILL & EMERY LLP

By: /s/ *Jennifer B. Routh*
Jennifer B. Routh, D.C. Bar No. 1032060
MCDERMOTT WILL & EMERY LLP
500 North Capitol Street, N.W.
Washington, D.C. 20001
Tel: (202) 756-8000
Fax: (202) 756-8087
jrouth@mwe.com

Terrence J. Dee (*Pro Hac Vice* forthcoming)
Emilie E. O'Toole (*Pro Hac Vice* forthcoming)
MCDERMOTT WILL & EMERY LLP
444 W Lake Street, Suite 4400
Chicago, IL 60606-0029
Telephone: (312) 984-7715
Fax: (312) 277-9288
tdee@mwe.com
eotoole@mwe.com

*Attorneys for CTIA – The Wireless Association*

## **LOCAL CIVIL RULE 7(M) CERTIFICATION**

      I certify that, pursuant to Local Rule 7(m), counsel for CTIA conferred with counsel for Respondents regarding the subpoena and this motion.  With respect to preemption, the parties were not able to reach agreement.  Therefore, Respondents oppose this motion.  With respect to the burden argument, the parties did not substantively address the merits but agreed to revisit the scope and burden of the Subpoena if the Court resolves the preemption issue against CTIA.

                                                  /s/ *Terrence J. Dee*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2020, I electronically filed the Memorandum in Support of CTIA – The Wireless Association's Motion to Quash Plaintiff's Subpoena *Duces Tecum* with the Clerk of the Court using the CM/ECF system and served a copy of the foregoing by certified U.S. mail and electronic mail on the following:

> Jessica H. Meeder
> FEGAN SCOTT LLC
> 1200 G Street NW, Suite 800
> Washington, D.C. 20005
> (202) 434-8992
> jessica@feganscott.com

/s/ *Jennifer B. Routh*
Jennifer B. Routh